## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KEVIN LEISKE, JOSEPH )
CHRISTOPHER LEWIS, )
and MARGARET SLEMMER, )
            )
    Plaintiffs, )
            )
   v. )
            )
ROBERT GREGORY KIDD, )
PACIFIC PREMIER TRUST )
CUSTODIAN FBO ROBERT G. )
KIDD IRA, and PACIFIC PREMIER )
TRUST CUSTODIAN FBO ROBERT )
G. KIDD ROTH IRA, )
            )
    Defendants. )
            )

C.A. No. 1:25-cv-00599-RGA

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF OF INTERIM ADVANCEMENT**

**ORAL ARGUMENT REQUESTED**

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF OF INTERIM ADVANCEMENT

OF COUNSEL:

Kenneth P. Herzinger
PAUL HASTINGS LLP
101 California Street
Forty-Eighth Floor
San Francisco, CA 94111
(415) 856-7000

Jennifer Baldocchi
PAUL HASTINGS LLP
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA 90071
(213) 683-6000

Dated: June 20, 2025

POTTER ANDERSON & CORROON LLP
   Kevin R. Shannon (#3137)
   Christopher N. Kelly (#5717)
   Heather S. Townsend (#7274)
   1313 North Market Street
   Hercules Plaza, 6th Floor
   Wilmington, Delaware 19801
   (302) 984-6000
   kshannon@potteranderson.com
   ckelly@potteranderson.com
   htownsend@potteranderson.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................. 3

    A.   Hard Yaka's Formation And Structure. ................................................. 3

    B.   Plaintiffs' Scheme. ................................................................................ 4

    C.   Plaintiffs Create Fraudulent Indemnification Agreements. ................... 5

    D.   Plaintiffs Spring Their Trap. .................................................................. 7

III.  PROCEDURAL BACKGROUND..................................................................... 8

IV.   ARGUMENT ..................................................................................................... 9

    A.   Plaintiffs Have Not Shown A Likelihood Of Success On The Merits. ................ 10

        1.   The Indemnification Agreements Are Unenforceable............................ 10

        2.   Plaintiffs' Interim Advancement Arguments Fail..................................... 13

    B.   Plaintiffs Fail To Show Irreparable Harm. ......................................... 16

    C.   The Balance Of Equities And Public Policy Tip In Favor Of Defendants. .......... 17

    D.   In The Unlikely Event An Injunction Does Issue, A Bond Should Be Required ................................................................................................ 19

    E.   No Court Should Enter Injunctive Relief Until It Determines It Has Jurisdiction .......................................................................................... 20

V.    CONCLUSION................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott v. Equity Grp., Inc.,*
    2 F.3d 613 (5th Cir. 1993) .................................................................................12

*Acierno v. New Castle Cnty.,*
    40 F.3d 645 (3d Cir. 1994)..................................................................................16

*Adams v. Freedom Forge Corp.,*
    204 F.3d 475 (3d Cir. 2000)...............................................................................16

*Agspring, LLC v. NGP X US Holdings, L.P.,*
    C.A. No. 2019-1021-JRS, 2022 WL 170068 (Del. Ch. Jan. 19, 2022) ...................13

*Alenyikov v. Goldman Sachs Grp., Inc.,*
    2012 WL 6603397 (D.N.J. Dec. 14, 2012)..........................................................17

*Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP,*
    528 F.3d 176 (3d Cir. 2008)...............................................................................16

*Betz v. Trainer Wortham & Co., Inc.,*
    236 F. App'x 253 (9th Cir. 2007) ........................................................................15

*Brown v. Partipilo,*
    C.A. No. 1:10CV110, 2010 WL 3979802 (N.D.W. Va. Oct. 8, 2010)....................19

*Brown v. Wells Fargo Bank, N.A.,*
    168 Cal. App. 4th 938 (Cal. Ct. App. 2008) ........................................................15

*In re Diet Drugs,*
    282 F.3d 220 (3d Cir. 2002)...............................................................................20

*Doe v. Del. State Univ. Bd. of Trustees,*
    2021 WL 2036670 (D. Del. May 21, 2021)...........................................................9

*Dougherty v. Mieczkowski,*
    661 F. Supp. 267 (D. Del. 1987)...................................................................11, 14

*E.I. d Pont de Nemours & Co. v. Agfa-Gavaert NV,*
    335 F. Supp. 3d 657 (D. Del. 2018).....................................................................20

*Elliott v. Kiesewetter,*
    98 F.3d 47 (3rd Cir. 1996)............................................................................16, 19

*Emerging Europe Growth Fund, L.P. v. Figlus,*
    C.A. No. 7936-VCP, 2013 WL 1250836 (Del. Ch. Mar. 28, 2013) .......................12

*Fair v. Bakhtiari,*
    195 Cal. App. 4th 1135 (Cal. Ct. App. 2011) ......................................................15

*Frank's GMC Truck Ctr., Inc. v. General Motors Corp.,*
    847 F.2d 100 (3d Cir. 1988)...............................................................................17

ii

*Freedom Mortg. Corp. v. Irwin Fin. Corp.*,
  C.A. No. 08-146, GMS, 2009 WL 763899 (D. Del. Mar. 23, 2009) ..................................... 19

*Gandhi-Kapoor v. Hone Cap. LLC*,
  305 A.3d 707 (Del. Ch. 2023) ............................................................................................. 16

*Havas v. Alger*,
  85 Nev. 627 (1969) ............................................................................................................. 11

*Homestore, Inc. v. Tafeen*,
  888 A.2d 204 (Del. 2005) .................................................................................................... 17

*Issa v. School Dist. of Lancaster*,
  847 F.3d 121 (3d Cir. 2017) ........................................................................................... 10-11

*Johnson v. Farm Journal, Inc.*,
  C.A. No. 19-1953, 2019 WL 3530423 (E.D. Pa. Aug. 1, 2019) ............................................ 17

*Johnson v. Odeco Oil & Gas Co.*,
  864 F.2d 40 (5th Cir.1989) .................................................................................................. 10

*In re Kennedy*,
  442 A.2d 79 (Del. 1982) ...................................................................................................... 18

*Koehnen v. Herald Fire Ins. Co.*,
  89 F.3d 525 (8th Cir. 1996) ................................................................................................. 10

*National Union Fire Ins. Co. of Pittsburgh v. Turtur*,
  892 F.2d 199 (2d Cir. 1989) ................................................................................................ 12

*Perryman v. Stimwave Techs. Inc.*,
  2020 WL 2465720 (Del. Ch. Apr. 1, 2020, revised May 13, 2020) (Ltr. Op.) ................. 10, 13

*Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc.*,
  335 F.3d 235 (3d Cir. 2003) ................................................................................................ 19

*TCV VI, L.P. v. TradingScreen Inc.*,
  2018 WL 1907212 (Del. Ch. Apr. 23, 2018) ........................................................................ 18

*Trascent Mgmt. Consulting, LLC v. Bouri*,
  152 A.3d 108 (Del. 2016) .................................................................................................... 15

*Valencia v. Blue Hen Conference*,
  476 F. Supp. 809 (D. Del. 1979) .......................................................................................... 10

*W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*,
  461 U.S. 757 (1983) ............................................................................................................ 19

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................................................ 9, 10

*Wright Constr. Co. v. Bank of Del.*,
  510 A.2d 491 (Del. 1986) .................................................................................................... 14

**RULES**

Cal. R. Prof. Conduct 1.4(a)(4)...................................................................................12

Cal. R. Prof. Conduct 1.4(b) ...............................................................................12, 15

Cal. R. Prof. Conduct 1.7...........................................................................................12

Cal. R. Prof. Conduct 1.7(a) ......................................................................................15

Cal. R. Prof. Conduct 1.8...........................................................................................15

Del. Lawyers R. Prof. Conduct 1.8 ...........................................................................18

Fed. R. Civ. P. 65(c) ...................................................................................................19

**TREATISES**

Restatement (Second) Contracts § 164 (1981) ....................................................11, 14

## I.    <u>INTRODUCTION</u>

This is not a typical advancement action. It arises from fraudulent contracts prepared by an attorney who violated his ethical obligations to Defendant Greg Kidd. Plaintiff Kevin Leiske was Kidd's personal attorney. He and his co-conspirators, Plaintiffs Margaret Slemmer and Christopher Lewis, were also officers and managers of Kidd's investment companies, including a fund holding about $500 million. To be clear, this is a fund of one. Kidd is, and has always been, the Fund's only investor, indirectly via a limited partnership.

While Plaintiffs all owed duties to Kidd, Leiske, in particular, owed the highest fiduciary duty to Kidd as his attorney. Rather than protecting Kidd's interests, Plaintiffs created a scheme to lock Kidd out of his $500 million investment in Hard Yaka Ventures, LP. In furtherance of this scheme, Plaintiffs fraudulently procured *personal* indemnity agreements from Kidd in February 2024. They planned to use the agreements to force Kidd to pay their fees when litigation inevitably followed their illegal attempt to seize control of his assets. The author of those agreements and an indemnitee is, remarkably, attorney Leiske, despite his affirmative duties of disclosure and candor. Kidd hired Leiske to review agreements on his behalf and protect his interests. Yet, neither Leiske – nor any of the Plaintiffs – informed Kidd of their scheme or the true purpose of the agreements on which they now rely. This was fraud.

Now, Plaintiffs seek a mandatory preliminary injunction ordering interim advancement for their legal fees in this action (Count II, *i.e.*, their "fees on fees" claim) based on those fraudulent agreements. The motion is a transparent and improper attempt by Plaintiffs to profit from their fraud before the Indemnification Agreements are declared void. Plaintiffs also neglect to inform the Court that Defendant Kidd filed a motion for preliminary injunction in the Nevada District Court before Hon. Christina Silva on May 6 – one month *before* Plaintiffs filed this redundant motion – to prevent Plaintiffs from obtaining advancement of their attorneys' fees. Thus, the *very*

*same* advancement issues underlying this motion are already pending in the Nevada District Court. There, Judge Silva is presiding over the litigation addressing the facts underlying Plaintiffs' fraudulent scheme and contracts in a case initiated over four months ago; Plaintiffs have already voluntarily intervened in that case and consented to jurisdiction there. What is more, Judge Silva scheduled a June 23 hearing to address Kidd's motion for preliminary injunction to enjoin the requested advancement and the related forum issues. Plaintiffs' forum-shopping hampers judicial efficiency and risks conflicting rulings.

Contrary to Plaintiffs' arguments, Kidd properly removed this action (previously in the Delaware Court of Chancery) to this Court, with the intent to transfer to Nevada because no Delaware court possesses both subject matter and personal jurisdiction – and these issues are already raised in the Nevada Action.[1]

Moreover, as explained in Kidd's Opposition to Plaintiffs' Motion to Remand (D.I. 23), the Delaware forum selection clause in the Indemnification Agreements resulted solely from attorney Leiske's flagrant violations of his ethical duty to disclose and avoid conflicts of interest with his client, Kidd. Moreover, as explained in Defendants' Motion to Dismiss or Stay, filed on May 21 (D.I. 20), Chancery lacks subject matter jurisdiction over this case, and no other Delaware court possesses personal jurisdiction over Defendants. The Nevada District Court, where pending litigation will address the overall fraudulent conspiracy that produced the indemnity agreements, is the appropriate forum. This Court should deny Plaintiffs' motion, or alternatively, stay it pending resolution of the first-filed Nevada case. And, in any event, it is improper to do what Plaintiffs are asking here – enter affirmative relief without addressing threshold jurisdictional issues.

In addition to the jurisdictional deficiencies, Plaintiffs' motion fails in substance. Plaintiffs

---

[1] *See* Defendants' Motion to Transfer, filed concurrently herewith.

neglect to acknowledge that they are seeking a mandatory injunction – essentially asking for entry of the final relief they seek – and accordingly are subject to a more onerous standard that they cannot meet. Plaintiffs are not likely to succeed on their advancement claim because, among other things, the indemnity agreements were fraudulently procured by faithless fiduciaries. Nor is there threat of irreparable harm. This case is about money. Plaintiffs are sophisticated multi-millionaires. In the last two years alone, they withdrew about ***$30 million*** from the Hard Yaka entities. They have the money to pay for their fees to litigate this case. Conversely, Kidd will no doubt be harmed if ordered to pay Plaintiffs' fees to sue him (footing the bill for both sides of the litigation) in the interim before the Nevada District Court rules on the validity of the underlying Indemnification Agreements. The motion should be denied.

## II.    **FACTUAL BACKGROUND**[2]

### A.    **Hard Yaka's Formation And Structure.**

In 2010, Kidd and his family created the investment entity Hard Yaka Inc. Ex. 1 ("Kidd Decl."), at ¶ 3.[3] At Kidd's direction, that entity invested in a variety of tech, crypto, and banking companies. *Id.* In recent years, Kidd also pursued a new venture, United States Bank Coin ("USBC"). *Id.*, at ¶ 4. In 2022, with Hard Yaka Inc. rapidly growing, Kidd brought in advisors experienced in financial services whom he thought he could trust with his money, including Plaintiffs, to assist him with managing his investments. *Id.*, at ¶ 5. He turned to trusted adviser and personal friend, Margaret Slemmer, who brought in attorney Leiske (who had served as counsel

---

[2] The factual background underlying this motion is largely the same as that surrounding Plaintiffs' Motion to Remand and Defendants' Motion to Dismiss or stay. Accordingly, the factual recitation herein largely tracks Defendants' submissions in connection with the prior motions and is repeated for the Court's convenience.

[3] Exhibits ("Ex.") referenced herein are attached to the Declaration of Heather S. Townsend in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunctive Relief of Interim Advancement, filed herewith.

for Hard Yaka Inc. and Kidd personally), Plaintiff Lewis, and Brett Beldner. *Id.*, at ¶¶ 6-8.

Upon the hiring of these individuals to help run administrative operations, Kidd directed them to update the Hard Yaka structure to be tax efficient, as well as provide an at-will compensation pool to share the upside from his efforts. *Id.*, at ¶ 12, Ex. A. Kidd's intention was to provide an incentive compensation arrangement that was tax efficient; it was not to provide the team of advisors with governance authority. *Id.*, at ¶ 12.

The update of the company's structure involved the creation of several entities. *See* Ex. 2 (Hard Yaka organizational chart). This includes Hard Yaka Ventures, LP (the "Fund"), which holds the assets of Hard Yaka LLC (the "LP") which is indirectly and wholly owned by Kidd. Kidd Decl., at ¶ 10. The LP is the sole limited partner of the Fund, and the only investor that has put any money into the Fund—meaning Kidd, and only Kidd, has invested in the Fund. *Id*. Hard Yaka Ventures GP, LLC (the "GP") was formed as the general partner of the Fund. *Id*., at ¶ 11.

Slemmer, Leiske, Lewis, and another adviser not involved in this action (Jun Hiraga) were originally admitted as members of the GP; Beldner was later admitted as a member as well. *Id.*, at ¶ 11. Plaintiffs were also hired as at-will employees of Hard Yaka Ventures Management Co., LLC (the "Management Company"). *Id*., at ¶ 9. To incentivize their alignment with his initiatives, Kidd allowed Plaintiffs to earn performance allocations through the GP—essentially a percentage of the profits earned by the Fund. *Id.*, at ¶ 12. To date, these individuals have collected close to $30 million worth of performance allocations. *Id.*

## B. **Plaintiffs' Scheme.**

Soon after being hired, Plaintiffs began laying the groundwork to extort Kidd. The scheme began when Kidd instructed attorney Leiske to prepare formation documents to restructure the Hard Yaka ecosystem. *See id.*, at ¶¶ 12, 13. Given his relationship with Plaintiffs and his trust in his attorney, Leiske, Kidd believed that Plaintiffs would act in furtherance of his interests; they did

the opposite. *Id.* Despite Kidd's clearly articulated instructions regarding what he hoped to accomplish through the restructuring, Plaintiffs, with attorney Leiske on the pen, drafted provisions in the organizational documents favorable to Plaintiffs and adverse to Kidd's interests. *Id.* During this time, Plaintiffs were secretly planning to extract millions more from Kidd before ultimately stripping him of his access to, and use of, the Fund.[4]

### C.    Plaintiffs Create Fraudulent Indemnification Agreements.

In planning their scheme, Plaintiffs realized there were potential gaps in the original Fund documents; they wanted indemnification protections for actions taken outside the scope of their duties to the Fund (*i.e.*, engaging in self-dealing and/or springing the trap they laid for Kidd). *See* D.I. 20, Ex. 12 (Plaintiffs' Motion To Enjoin Defendants From Obtaining Advancement in the Nevada Action) (the "NV Inj. Mot.") at 5. This is not a typical case of an officer or director being sued for something they did at work and asking the company to pay those work-related expenses. Far from it. Instead, Plaintiffs are seeking to have Kidd *personally* pay fees that Plaintiffs are incurring by acting *against* Kidd's interests, *outside* of their work for the Hard Yaka company that employed them. Likewise, the agreements on which they rely were prepared by *Kidd's personal lawyer*, Leiske, without any disclosure and waiver of the inherent conflict of interest caused by a lawyer asking his client for personal indemnification should a dispute develop between them.

In private Slack messages among Plaintiffs, on March 23, 2023, Slemmer asked attorney Leiske, "*Do we have indemnifications in place for you, Chris and me? I feel like if we do they r*

---

[4] *See, e.g.*, Ex. 3 ("Bouchie Decl."), at ¶ 18, Ex. P (discussing manipulating Kidd to approve distributions on Christmas, or "if he drank" on New Year's Eve). These plans were on a hidden Slack Channel referred to as "Team Carry," named after the 12% performance allocation Plaintiffs were intent on collecting—*forever*—from Kidd's investments, in private, where they complained about Kidd, "*stop being f[***]ing greedy, I want my f[***]ing carry*" from Slammer. D.I. 20, Ex. 7, at ¶¶ 7, 77. At the same time, they mocked his ideas as "*rainbow unicorns coming out of his a[**]*", with Slemmer stating that "*no regulator wants to see [his] janky a[**] idea*" and that she "*hate[s] him.*" *Id.*, at ¶¶ 67-68.

*stale. Pls advise. I would like to ensure that if something goes wrong HY/Greg will b responsible for covering my costs whatever those may be.*" *See* Bouchie Decl., at ¶ 15, Ex. M. Attorney Leiske responded, "*We do not have one for me. I know that and need one. Agreed that we should all have them. I'll get them drafted.*" *Id.*

Once again, Leiske (while serving as Kidd's personal counsel) took the pen, and in February 2024, each Plaintiff purported to enter into Indemnification Agreements with Kidd (the "Indemnification Agreements"). Kidd Decl., at ¶ 14. The Indemnification Agreements were prepared by Leiske to benefit himself and the other Plaintiffs (and directly contrary to the interests of his client, Kidd). *Id.* To do this, attorney Leiske, believing that Delaware would favor him over his client, found an industry sample form publicly available from the National Venture Capital Association that addresses Delaware corporate law, and then "*massage[d]*" it (as Leiske himself described it) by stripping out the typical protections for his client, Kidd, as his Indemnitor, while increasing the rights of Plaintiffs as Indemnitees.[5]

These revisions included deleting *entire sections* about the process for deciding whether indemnity or advancement was owed, or how such decisions would be made—leaving a crucial gap in the agreement. *See* Ex. 4 ("Baldocchi Decl."), at ¶ 4, Ex. B. Attorney Leiske also went so far as to make Kidd and his two IRA accounts (nominal Defendants here) as the Indemnitors, rather than the entity for which Plaintiffs purportedly served as managers (which is customary under Delaware law and the industry standard). Bouchie Decl., at ¶ 5, Ex. C. But the most shocking change that Leiske made was to add Section 7(d), *upon which Plaintiffs now rely in their motion*,

---

[5] *See* Bouchie Decl., at ¶ 16, Ex. N (Slemmer: "*How's the indemnification coming? I really want to ensure if I get impacted by a dispute/lawsuit/etc HY will cover all my costs*"; Lewis: "*Yes please!!*" Leiske: "*Good. I'm actually getting them done today. Sergio sent over the nvca form basically so I needed to massage it some*").

which provides for an award of fees on fees *regardless* of success on the merits of their advancement claim. *See* Baldocchi Decl., at ¶ 4, Ex. B. This means Kidd and his IRAs are not only purportedly required to personally pay Plaintiffs' attorneys' fees, but must also fund both sides of the advancement action Plaintiffs filed even if the Court denies their advancement claims. Such unconscionable provisions are unprecedented.

On February 27, 2024, Slemmer's assistant, Shana Duncan, sent an email to Kidd, Slemmer, Leiske, and Lewis, that she "circulated docusign requests for partner indemnity agreements this morning," and that agreements were "drafted to ensure proper protections for partners, related to the work they do for *non-Hard Yaka entities*." Bouchie Decl., at ¶ 13, Ex. K. At no point did attorney Leiske ever disclose his conflicts of interests to his client, Kidd, nor did Leiske seek a waiver of these conflicts of interests from Kidd, as required. *See* NV Inj. Mot. 7.

### D.   Plaintiffs Spring Their Trap.

Beginning in late 2024 or early 2025, Kidd indicated he wanted to transition from the investment model to focus on his USBC project, and as a consequence, planned to wind down the partnership; Plaintiffs disagreed. Kidd Decl., at ¶¶ 15, 16. For Plaintiffs, the moment to spring their trap had arrived, as they feared an end to their performance allocations. Much to Kidd's surprise, Plaintiffs responded by informing Kidd they would only *allow* a wind down and for Kidd to access his *own* investments and capital if Kidd agreed to pay $25 million dollars of "*cold hard cash*" immediately to Plaintiffs. *Id*. Seeing no other choice, Kidd offered to pay the $25 million ransom, but only as the amount of performance allocations became earned on investments in the Fund. *See id.*, at ¶ 17, Ex. B. Plaintiffs refused and demanded an immediate payment. *See id*.

In an attempt to justify their extortion, Plaintiffs contend that, under the Fund documents attorney Leiske prepared, Plaintiffs (not Kidd) control the approximate $500 million in the Fund— all of which is Kidd's money—and that Kidd is powerless to access or use money from the Fund

7

without their consenting vote. Baldocchi Decl., at ¶ 7, Ex. E (Ex. E at ¶ 14). After unsuccessful attempts to resolve the impasse and beginning to recognize Plaintiffs' fraudulent scheme, Kidd terminated Plaintiffs' employment with the Management Company, and litigation ensued.

## III.    PROCEDURAL BACKGROUND

On February 10, 2025, Kidd's investment vehicle (the LP) sought recourse in Nevada state court (the "Nevada Action"). The operative complaint alleges claims for breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and fraud against Plaintiffs. As requested relief, Kidd and the LP seek to unwind Plaintiffs' improper amendments to the documents underlying the Fund and the Fund's GP.

The day after the LP filed the Nevada Action, Plaintiffs and non-party Beldner (the "Conspirators") initiated a retaliatory emergency JAMS Arbitration against Kidd and non-party Jun Hiraga, which, sought indemnification and advancement (the "Arbitration"). *Id.*, at ¶ 5, Ex. C. On February 12, Plaintiffs[6] sent a demand for advancement for the Nevada Action and the Arbitration to Defendants. *Id.*, at ¶ 7, Ex. E. On March 2, the Conspirators *voluntarily* intervened as defendants in the Nevada Action, and they removed that action to the District of Nevada. On March 4, the arbitrator postponed emergency relief because the issues were already being litigated in the Nevada Action. *Id.*, at ¶ 5, Ex. C at 1. On March 12, the LP and Kidd filed a First Amended Complaint in the Nevada Action. NV Compl. On March 25, the general arbitration seeking advancement was stayed pending the Nevada Action. *Id.* Critically, the Conspirators then told the Nevada court that "*[i]n the interest of efficient, economical resolution of the parties' dispute," they "will pursue their claims [raised in the Arbitration] against Kidd here[.]*" D.I. 20, Ex. 8 at 4 n.4.

---

[6] Beldner did not join the demand or the Advancement Action; he did not have an Indemnification Agreement with Defendants.

On March 25, Plaintiffs sent another demand for payment of expenses incurred in the Nevada Action and the Arbitration. Baldocchi Decl., at ¶ 8, Ex. F . Defendants responded on April 7 refuting Plaintiffs' allegations. D.I. 20, Ex. 10. On April 21, Plaintiffs initiated this action in Delaware Court of Chancery and sent another demand for advancement to Defendants. Baldocchi Decl., at ¶ 6, Ex. D. On May 6, the LP and Kidd filed a motion to enjoin Plaintiffs from obtaining advancement until the Nevada court can rule on the validity of the fraudulently prepared documents, including these Indemnification Agreements. *See*, *e.g.*, Kidd Declaration. On May 13, after the Magistrate in Chancery directed the parties to submit a proposed expedited scheduling order (including briefing on dispositive motions), Plaintiffs filed an Amended Complaint in the Advancement Action, which purported to add new facts and claims.

On May 14, Defendant Kidd filed in this Court a Notice of Removal based on diversity. On May 19, Plaintiffs filed a Motion to Remand and sought expedition in connection with that motion. On May 21, Defendants moved to dismiss or stay this case for lack of personal jurisdiction and in favor of the prior pending Nevada Action.[7] Concurrent with this motion, Defendants file a motion to transfer this case to the Nevada federal court, where there is no dispute as to the jurisdiction of the parties or subject matter and where the court is already familiar with the case.

## IV.    **ARGUMENT**

Preliminary injunctive relief is "an extraordinary remedy." *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008). The remedy Plaintiffs seek here is especially "extraordinary," as they are seeking a mandatory injunction effectively granting them the final relief they seek in this case. *Doe v. Del. State Univ. Bd. of Trustees*, 2021 WL 2036670, at *2 (D. Del. May 21, 2021)

---

[7] This Motion, Plaintiffs' Motion to Remand (D.I. 11), and Defendants' Motion to Dismiss or Stay Proceedings (D.I. 19) all raise the threshold issue of whether any court in Delaware has jurisdiction over these proceedings. It therefore would be most practical and efficient for the motions to be decided together.

("An injunction is 'mandatory' if such an injunction would 'alter the status quo by commanding some positive act.'") (citation omitted). "When seeking a mandatory injunction, the burden on the moving party is 'particularly heavy,' and the movant's right must be 'indisputably clear.'" *Id.* "The power to issue a preliminary injunction, especially a mandatory one…should be sparingly exercised." *Valencia v. Blue Hen Conference*, 476 F. Supp. 809, 816-17 (D. Del. 1979), *aff'd*, 615 F.3d 1355 (3d Cir. 1980).[8]

Here, Plaintiffs cannot meet their heavy burden to show "[1] that [they are] likely to succeed on the merits, [2] that [they are] likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [their] favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20.[9]  Moreover, as explained below, the court cannot enter the extraordinary affirmative relief Plaintiffs request without first deciding Defendants' pending jurisdictional challenges.

**A.    Plaintiffs Have Not Shown A Likelihood Of Success On The Merits.**

**1.    The Indemnification Agreements Are Unenforceable.**

To demonstrate a likelihood of success on the merits, Plaintiffs must show a "'reasonable probability' of success." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (citation

---

[8] Plaintiffs rely primarily on the Delaware Court of Chancery's decision in *Perryman v. Stimwave Techs. Inc.*, C.A. No. 2020-0079-SG (Del. Ch. Apr. 1, 2020, revised May 13, 2020) (Ltr. Op.), which is generally inapposite for the reasons discussed more fully herein.  In *Stimwave*, the operative facts were not disputed. Here, given the strong fraud claims, Plaintiffs cannot (and do not even attempt to) establish that their purported right to the requested relief is "indisputably clear."

[9] In addition to the substantive obstacles to remand (D.I. 11), Plaintiffs' motion for injunctive relief, asking the District Court—not Chancery—to evaluate the merits of their claims and grant extraordinary relief, further confirms that remand should be denied. *See Koehnen v. Herald Fire Ins. Co.*, 89 F.3d 525, 528 (8th Cir. 1996) ("A party that engages in affirmative activity in federal court typically waives the right to seek a remand"); *Johnson v. Odeco Oil & Gas Co.*, 864 F.2d 40, 41-42 (5th Cir. 1989) (affirming district court's refusal to remand where plaintiff participated in discovery and other pretrial litigation matters in federal court).

omitted). They cannot do so. As detailed in Kidd's motion for preliminary injunction in the Nevada Action, the Indemnification Agreements are void because they were procured through fraud. *See Dougherty v. Mieczkowski,* 661 F. Supp. 267, 274 (D. Del. 1987) ("If the fraud relates to the inducement to enter the contract, then the agreement is 'voidable' at the option of the innocent party.") (citing Restatement (Second) Contracts § 164 cmt. a (1981) ("A misrepresentation may make a contract voidable"); *Havas v. Alger*, 85 Nev. 627, 631 (Nev. 1969) ("Fraud in the inducement renders [a] contract voidable," and a "person defrauded may rescind" the contract).

Specifically, Plaintiffs—led by attorney Leiske—violated their fiduciary duties and committed fraud when they drafted the Indemnification Agreements to escape liability for their own misconduct and seek their attorney's fees if challenged, while failing to disclose their scheme to Kidd. Instead, Plaintiffs misrepresented the scope and purpose of the agreements. The only explanation that Kidd received of the Indemnification Agreements was an email sent by Slemmer's assistant, copying each Plaintiff, asking for his signature on the agreements:

---------- Forwarded message ----------
From: **Shana Duncan** <shana@hardyaka.com>
Date: Tue, Feb 27, 2024 at 11:29 AM
Subject: Partner Indemnity Agreement
To: Kidd, Greg <gregkidd@gmail.com>, Jun Hiraga <jun@hardyaka.com>, Margaret
Slemmer <margaret@hardyaka.com>, Kevin Leiske <kevin@hardyaka.com>, Chris Lewis
<chris@hardyaka.com>
Cc: Emily Castelli <emily@global.id>

Hi all,
I circulated docusign requests for partner indemnity agreements this morning. For context, this
agreement was drafted to ensure proper protections for partners, related to the work they do
for non-Hard Yaka entities. If you have any questions, please feel free to direct them to Kevin.

-Shana

That email misrepresented that the agreements related only to "proper protections" for Plaintiffs for "work they do for *non-Hard Yaka* entities." Bouchie Decl., at ¶ 13, Ex. K. This is a stark contrast to the demand they make now – the disputes for which Plaintiffs seek fees have zero to do with "work they do for *non-Hard Yaka* entities." In truth, Plaintiffs had admitted in private messages that the agreements actually were for "if something [went] wrong" so that *Kidd*

*personally* "will b responsible" particularly "if a lawsuit arose." *Id.*, at ¶ 15, Ex. M. Rather than providing "proper protection," Plaintiffs had stripped out standard language for determining indemnity, inserted unconscionable fee provisions allowing recovery even if they *lost*, and removed protections for the indemnitor (Kidd). Leiske, a California-licensed attorney, did not disclose any of this to his client, nor did he obtain the requisite conflict waiver in preparing the contracts *against* his client's interests (as required by Cal. R. Prof. Conduct 1.7). None of the Plaintiffs explained the true nature of the agreements to Kidd, as required by their fiduciary duties, including Leiske's duties of loyalty and candor under Cal. R. Prof. Conduct 1.4(a)(4), (b).

Taken as a whole, Plaintiffs' fraud vitiates the Indemnification Agreements. *See National Union Fire Ins. Co. of Pittsburgh v. Turtur*, 892 F.2d 199, 203 (2d Cir. 1989) ("[T]he underlying subscription agreements . . . if the latter were induced by fraud, the Indemnification Agreements would be unenforceable."); *Abbott v. Equity Grp., Inc.,* 2 F.3d 613, 625 (5th Cir. 1993) ("In *Dealy*, we held that an indemnity agreement is unenforceable due to fraud in the subscription agreement where the surety was 'a party to the fraud [as an aider or abettor] or a coconspirator in it.'"). This alone is grounds to deny Plaintiffs' motion. *Emerging Europe Growth Fund, L.P. v. Figlus*, 2013 WL 1250836, at *11 (Del. Ch. Mar. 28, 2013) (denying preliminary injunction on advancement claim; "Plaintiffs have not demonstrated that their interpretation of the Indemnification Provision, *i.e.*, that it applies to an alleged breach of the Partnership Agreement, is a reasonable one.").

At minimum, in light of these serious issues, Plaintiffs clearly have failed to show their purported right to advancement is "indisputably clear" – as is required to obtain the mandatory injunctive relief they seek. Nor have Plaintiffs shown an "indisputably clear" right for the especially unusual relief of having an attorney and his accomplices require his client to advance fees for an action in which Plaintiffs *voluntarily intervened* (the Nevada Action) and which *they*

*brought affirmatively* (this action).[10]

Plaintiffs have asserted that there was no fraud because the provisions at issue were included in the agreements that Kidd signed. But Leiske, Kidd's own personal lawyer, on whom he had every right to rely, not only added one-sided provisions to the Indemnification Agreements and structured them in a way that a non-lawyer may not appreciate, but he deleted common provisions that are typically included in such agreements, the omission of which even some skilled corporate and securities lawyers might not notice. Kidd had every right to rely on attorney Leiske to protect Kidd's interest when drafting such an agreement; he was not obligated to hire a second attorney to check his first attorney's work and ensure he was adhering to ethical duties.

## 2.    Plaintiffs' Interim Advancement Arguments Fail.

In their Motion, Plaintiffs make three arguments as to the merits of their interim advancement claim (Count II). Each fails.

First, Plaintiffs argue that they are entitled to advancement prior to the final disposition of this matter based on the "plain terms" of the Indemnification Agreements. Mot. p. 36. They primarily rely on an unpublished Delaware Court of Chancery opinion attached to their motion, *Perryman v. Stimwave Techs. Inc*., C.A. No. 2020-0079-SG (Del. Ch. Apr. 1, 2020, revised May 13, 2020) (Ltr. Op.).[11] But *Stimwave* is easily distinguishable. There, the company's former CEO (Perryman) and her husband sought advancement of legal fees related to a civil investigative

---

[10] Plaintiffs highly unusual contention that Kidd must advance their fees for claims that Plaintiffs elect to assert *against* Kidd is currently being litigated in the Nevada Action, including whether the Indemnification Agreements can credibly be read this way.

[11] Plaintiffs also cite an unpublished Delaware Chancery Court opinion, *Agspring, LLC v. NGP X US Holdings, L.P.*, C.A. No. 2019-1021-JRS, 2022 WL 170068, at *2 (Del. Ch. Jan. 19, 2022), for the proposition that "Delaware courts 'have required advancement while the parties litigate the validity of the underlying agreements that provide for advancement and indemnification.'" (citation omitted), *aff'd*, 288 A.3d 690 (Del. 2022). However, that quote does not relate to a ruling by the Court, but rather refers to a related arbitration.

demand by the Department of Justice into Stimwave's billing practices and a related action brought against them by Stimwave corporation for breach of fiduciary duty arising from alleged financial fraud. D.I. 37-2 at 6, 19-20. When the Perrymans sought advancement from Stimwave, the company disputed whether the advancement agreements (which were otherwise valid and had been approved by Stimwave's shareholders) were properly approved by Stimware's Board as a technical matter. The court ordered "interim" advancement of fees, reasoning that there was imminent irreparable harm "to the extent that there is a valid advancement contract" that required the Perrymans, as fiduciaries of the company, "the ability to defend actions that are brought arising out of their fiduciary duties." In contrast, Kidd challenges not just defects regarding approval of the Indemnification Agreements, but the entire construct of the fraudulent agreements presented to him by his attorney under false pretenses. Nor do the underlying claims on which Plaintiffs seek their fees arise from the ordinary course of their financial/administrative work for the Hard Yaka entities. Rather, they seek to use these agreements to fund their *offensive* scheme against Kidd to continue extracting millions from him in perpetuity. There is no precedent for this.

Second, Plaintiffs argue that fraud is not a defense to advancement. D.I. 37 at 6. That is not correct based on fundamental principles of contract law. To state the obvious, for there to be a contractual right, there must in the first instance be a valid and enforceable agreement. *See, e.g., Dougherty*, 661 F. Supp. at 274 (citing Restatement (Second) Of Contracts § 164) ("If the fraud relates to the inducement to enter the contract, then the agreement is 'voidable' at the option of the innocent party."); *Wright Constr. Co. v. Bank of Del.*, 510 A.2d 491, at *1 (Del. 1986) ("The indemnity provision which is the subject of the Superior Court's legal ruling will form a basis for recovery by the plaintiff [Bank] only in the event the Bank is determined not to have engaged in fraudulently inducing the defendant [Wright] to enter into the contract of which the indemnity is a

14

part.").[12]

Third, Plaintiffs blame any lack of disclosure not on fraud but on Kidd's "failure" to closely review the contracts. Mot. at p. 6. In taking this position, Plaintiffs ignore that Leiske was acting as Kidd's counsel at the time the contracts were entered. Again, Kidd did not have to hire a lawyer to check his lawyer's work. Leiske, as his counsel (licensed in California), owed the highest fiduciary duty to Kidd. *Fair v. Bakhtiari*, 195 Cal. App. 4th 1135, 1140-41 (Cal. Ct. App. 2011) (attorney-client fiduciary relation is "of the very highest character and binds the attorney to most conscientious fidelity—*uberrima fides*.") (citation omitted). He was obligated both to explain the highly complex and legalistic Indemnification Agreements and to disclose his conflicts of interest—neither of which he fulfilled.[13] Plaintiffs cannot now shift this blame to Kidd for relying on his own counsel; the law encourages such reliance. *See Brown v. Wells Fargo Bank, N.A.*, 168 Cal. App. 4th 938, 959 (Cal. Ct. App. 2008) ("If the defendant is in a fiduciary relationship with the plaintiff which requires the defendant to explain the terms of a contract between them, *the plaintiff's failure to read the contract would be reasonable*.") (emphasis added); *Betz v. Trainer Wortham & Co., Inc.*, 236 F. App'x 253, 255-56 (9th Cir. 2007) ("where a fiduciary relationship

---

[12] Plaintiffs' reliance on *Trascent Management Consulting, LLC v. Bouri*, 152 A.3d 108 (Del. 2016) is misplaced. Unlike here, *Trascent* involved a statutory summary advancement proceeding where an officer sought advancement against a defendant company, rather than under a personal agreement between two litigants. *Id.* at 109. Further, unlike here, the defendant company raised its fraudulent inducement claim only as to the officer's employment agreement. *Id.* The defendant's fraud claim did not go to the indemnification provisions in the employment agreement, and the company only raised the claim "belated[ly]." *Id.* at 112-13. Moreover, the case did not involve a lawyer violating his duties to his client in preparing one-sided, self-serving indemnification agreements to benefit the lawyer as the expense of the cleint. *Id.* at 109.

[13] *See, e.g.,* Cal. R. Prof. Conduct 1.4(b) (lawyer's duty to communicate so clients can make informed decisions); Cal. R. Prof. Conduct 1.7(a) (written consent required if "significant risk the lawyer's representation of the client will be materially limited by . . . the lawyer's own interests."); Cal. R. Prof. Conduct 1.8 (prohibiting lawyers from entering business transactions with clients or acquiring financial interest adverse to clients except in limited circumstances).

exists, 'facts which would ordinarily require investigation may not excite suspicion, and . . . the same degree of diligence is not required.'") (citation omitted, alteration in original). For all these reasons, Plaintiffs have failed to establish a substantial likelihood of success on Count II.[14]

### B.    Plaintiffs Fail To Show Irreparable Harm.

Plaintiffs must additionally demonstrate "a significant risk that [they] will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000) (citing *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102-03 (3d Cir. 1988)). Again, however, this case is just about money. Neither a mere risk of future harm nor a compensable, temporary loss of money constitutes irreparable harm. *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994) ("[I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury[.]"). Because granting Plaintiffs' preliminary injunction would require Kidd to take affirmative action, Plaintiffs bear a "heightened" burden to demonstrate irreparable harm. *See Bennington Foods, LLC v. St. Croix Renaissance Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008).

Plaintiffs do not specify what irreparable harm they will supposedly suffer if their motion is denied. As illustrated by the cases cited in Plaintiffs' motion, in the rare circumstance that advancement injunctions are issued, courts typically consider the movant's financial status to defend against litigation arising from their employment.[15] That is not the case here. Tellingly,

---

[14] Alternatively, if the Court seeks additional evidence on the issues briefed in this motion, an evidentiary hearing may be appropriate to address any disputed facts. *Elliott v. Kiesewetter*, 98 F.3d 47, 53 (3d Cir. 1996), *as revised* (Oct. 16, 1996) ("A district court cannot issue a preliminary injunction that depends upon the resolution of disputed issues of fact unless the court first holds an evidentiary hearing.").

[15] *Gandhi-Kapoor v. Hone Cap. LLC*, 305 A.3d 707, 713 (Del. Ch. 2023) (former CFO of hedge fund entitled to interim advancement based on valid indemnification agreement to defend against breach of fiduciary duty claims, where lack of timely advancements "prejudices [her] ability to defend the underlying litigation, potentially resulting in irremediable consequences, such as an

16

Plaintiffs who are represented by four different law firms nowhere say in their motion that they lack the resources to pay their legal fees.[16] Nor could they; they are successful professionals who were paid over *$30 million* in the last few years. As Plaintiffs' own litigation tactics demonstrate (including commencing numerous different cases), there is no threat of irreparable harm. *See Johnson v. Farm Journal, Inc.*, C.A. No. 19-1953, 2019 WL 3530423, at \*7 (E.D. Pa. Aug. 1, 2019) (no irreparable harm on advancement where "there is no indication that, absent a grant of his motion for a preliminary injunction, [counsel] would discontinue its representation of Johnson while this case remains pending"); *Alenyikov v. Goldman Sachs Grp., Inc.*, C.A. No. 12-5994 (KM), 2012 WL 6603397, at \*12-14 (D.N.J. Dec. 14, 2012).

## C.  The Balance Of Equities And Public Policy Tip In Favor Of Defendants.

The balance of hardships confirms that if the injunction is issued, Kidd will suffer substantial injury. Plaintiffs have already taken $30 million from Kidd and are now attempting to take millions more to pay their legal expenses to further their wrongful acts, which likely will only expand the litigation. Plaintiffs' private messages show that they "hate" Kidd (D.I. No. 23, ¶ 68) and want to "crush" his business endeavors. Bouchie Decl., at ¶ 19, Ex. Q, ¶ 22, Ex. T. Fee advancement will only fuel their animosity and leverage their $25 million ransom demand. If Plaintiffs are awarded unfettered interim advancement, they will be fully incentivized to continue to engage in aggressive litigation for as long as possible, hammering Kidd's business ventures until he relents and pays the ransom. Indeed, Plaintiffs' Slack messages show that they are using this entire dispute with this goal in mind. Equity should not—and does not—support letting them

---

adverse judgment or a conviction."); *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 212 (Del. 2005) (lack of advancement threatened to deprive employee of ability to effectively defend himself in a criminal trial in which he faced decades in prison if convicted).

[16]  Defendants are attempting to collect advancement fees for four different law firms—Willkie Farr & Gallagher LLP; Flynn, Giudici PLLC; Cohen Johnston LLC; and Richards, Layton & Finger, PA. *See* Baldocchi Decl., *generally*.

succeed by forcing Kidd to fund both sides of a dispute aimed at crushing his interests, based on self-serving documents they fraudulently drafted.[17]

By contrast, Plaintiffs no doubt are able to fund their own litigation expenses with no risk to their claims. They have already collected millions from Kidd in the form of generous GP distributions and annual salaries. They have intervened in and advanced on their own initiative (in the Nevada Action and arbitration) and sought their fees on fees in this action, *without* advancement. They have not submitted any evidence showing that the lack of advancement threatens their ability to litigate across these various actions.

Delaware public policy also weighs against Plaintiffs' motion. Delaware, like California (where Leiske is licensed), requires attorneys to uphold the highest level of fiduciary obligations. *See In re Kennedy*, 442 A.2d 79, 89 (Del. 1982) ("attorney is bound to the highest degree of fidelity and good faith.") (citation omitted). Delaware attorneys have similar duties to communicate, disclose conflicts, and avoid transactions with clients. *See, e.g.*, Del. Lawyers R. Prof. Conduct 1.8. Enforcement of these rules is a matter of public policy. *TCV VI, L.P. v. TradingScreen Inc.*, C.A. No. 10164-VCL, 2018 WL 1907212, at *6 (Del. Ch. Apr. 23, 2018) (strict adherence to attorney's obligations of fidelity and good faith, "required by time-honored, deeply rooted concepts of *public policy*.") (citation omitted). Allowing Plaintiffs to violate such principles and obtain interim advancement, wholly based on an attorney's violations of his ethical duties, would

---

[17] This is especially true given that Plaintiffs voluntarily intervened in the Nevada Action and submitted to the jurisdiction of the Nevada Court to contest the validity and enforceability of the agreements at issue. Plaintiffs also agreed to stay their arbitration claim for advancement against Kidd when they voluntarily intervened in that action, which Kidd to void the fraudulent bundle of agreements prepared by Plaintiffs long before Plaintiffs filed the Delaware advancement action. Significantly, the parties are focused on litigating in the Nevada Court the threshold issue of whether the Plaintiffs engaged in a fraudulent scheme to defraud Kidd of his money which, if proven, would render all the agreements void.

fly in the face of this forum's public policy. *See, e.g., Brown v. Partipilo*, C.A. No. 1:10CV110, 2010 WL 3979802, at *9 (N.D. W. Va. Oct. 8, 2010) (enforcement of forum selection would violate state public policy holding attorneys accountable for their actions). Moreover, Plaintiffs' motion—filed a month after Kidd's motion to enjoin the requested advancement —and violates Delaware's public policy interests in judicial efficiency. *See, e.g., Freedom Mortg. Corp. v. Irwin Fin. Corp.*, C.A. No. 08-146 GMS, 2009 WL 763899, at *6 (D. Del. Mar. 23, 2009) (holding that overlapping litigation "would violate Delaware's *public policies promoting judicial efficiency and comity* served by the first-filed rule," where the separate contracts at issue were "inextricably intertwined in these disputes") (emphasis added).

### D. In The Unlikely Event An Injunction Does Issue, A Bond Should Be Required

"Generally, a bond is a condition of preliminary injunctive relief." *Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc.*, 335 F.3d 235, 239 (3d Cir. 2003). Federal Rule of Civil Procedure 65(c) requires a successful applicant for a preliminary injunction to post a bond "in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." *Elliott*, 98 F.3d at 59 (citing Fed. R. Civ. P. 65(c)). Because a wrongfully enjoined party's recovery is limited to the amount of the bond, it must be an amount that will provide adequate recompense to the wrongfully enjoined party. *See, e.g., W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 770 n.14 (1983); *Sprint Commc'ns*, 335 F.3d at 240.

As explained herein, an injunction is improper and should not issue. If the Court were, however, to enter an injunction, a bond of $3.5 million should be required. Otherwise, Kidd's interests and rights may be trampled, and he would be forced to endure costs and damages resulting

from the wrongful issuance of an injunction. Given Plaintiffs' fraudulent conduct, a bond is clearly necessary given that it is unlikely that Kidd will be able to collect on Plaintiffs' undertakings should he prevail in this case.

### E. No Court Should Enter Injunctive Relief Until It Determines It Has Jurisdiction

Finally, Plaintiffs fail to address the fact that Defendants have challenged personal jurisdiction in this Court (and subject matter jurisdiction in the Court of Chancery). Before a court can grant the type of extraordinary, mandatory injunctive relief that Plaintiffs now seek, it must first determine it has jurisdiction over the matter and the person. As explained above and in other submissions, however, Defendants have shown that no Delaware court possesses jurisdiction over this matter because Chancery lacks subject matter jurisdiction, and Defendants' purported consent to Chancery as a forum, if valid at all, does not extend to any other Delaware court. That is why they seek to litigate all disputes in the pending Nevada Action, which has jurisdiction over all parties.

In any event, at minimum, Defendants' jurisdictional challenges as raised in their Motion to Dismiss or Stay must be decided before this injunction motion. *E.I. d Pont de Nemours & Co. v. Agfa-Gavaert NV*, 335 F. Supp. 3d 657, 665 (D. Del. 2018) ("[a] district court cannot enjoin a party if it does not have jurisdiction over that party") (alteration in original; citation omitted); *In re Diet Drugs*, 282 F.3d 220, 229 (3d Cir. 2002) ("preliminary matters such as personal jurisdiction should be raised and disposed of before the court considers the merits or quasi-merits of a controversy") (cleaned-up; citation omitted).

## V. CONCLUSION

Defendants respectfully request that the Court deny Plaintiffs' Motion for Preliminary Injunction.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Kenneth P. Herzinger
PAUL HASTINGS LLP
101 California Street
Forty-Eighth Floor
San Francisco, CA 94111
(415) 856-7000

Jennifer Baldocchi
PAUL HASTINGS LLP
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA 90071
(213) 683-6000

Dated: June 20, 2025

By: */s/ Kevin R. Shannon*
    Kevin R. Shannon (#3137)
    Christopher N. Kelly (#5717)
    Heather S. Townsend (#7274)
    1313 North Market Street
    Hercules Plaza, 6th Floor
    Wilmington, Delaware 19801
    (302) 984-6000
    kshannon@potteranderson.com
    ckelly@potteranderson.com
    htownsend@potteranderson.com

*Attorneys for Defendants*